SIDNEY COAL CO., INC.,
et al., Plaintiffs,

v.

Larry G. MASSANARI, Defendant,

and

Michael H. Holland, et. al.,
Intervenor–Defendants.

No. CIV.A.01–76–DCR.

United States District Court,
E.D. Kentucky,
Pikeville Division.

July 23, 2002.

Order Entering Partial Final
Judgment Sept. 5, 2002.

H. Kent Hendrickson, Rice & Hendrickson, Harlan, KY, John R. Woodrum, W. Gregory Mott, Heenan, Althen & Roles, Washington, DC, for Sidney Coal Company Inc., Martin County Coal Corporation, New Ridge Mining Company, A.T. Massey Coal Company, Inc., Road Fork Development Company, Inc., Rawl Sales & Processing Co. dba Tall Timber Coal Company dba Big Bottom Coal Company dba PM Charles Coal Company dba Rocky Hollow Coal Company, Tennessee Consolidated Coal Company, Omar Mining Company, Peerless Eagle Coal Co., Inc., Big Bottom Coal Company, PM Charles Coal Company, Rocky Hollow Coal Company, plaintiffs.

Joseph L. Famularo, U.S. Attorney's Office, EDKY, Lexington, KY, Brian G. Kennedy, U.S. Department of Justice, Richard G. Lepley, Stuart E. Schiffer, U.S. Department of Justice, Civil Division, Washington, DC, for Social Security Administration, William A. Halter, Acting Commissioner, defendants.

Linda J. Wallbaum, Kevin R. Winstead, Sales, Tillman & Wallbaum, Louisville, KY, Stephen J. Pollak, John Townsend Rich, Howard R. Rubin, Michele Lee Svonkin, Jeffrey D. Fox, Shea & Gardner, Washington, DC, for Michael H. Holland, Elliot Segal, William P. Hobgood, Marty D. Hudson, Thomas O.S. Rand, Carl E. Van Horn, Gail R. Wilensky, intervenor defendants.

## MEMORANDUM OPINION AND ORDER

REEVES, District Judge.

This matter is before the Court for consideration of the Plaintiffs' Motion for Summary Judgment [Record No. 34], Defendant Larry G. Massanari's Motion to Transfer or, in the Alternative, for Summary Judgment [Record No. 48] and the Intervenor–Defendant's Motion for Summary Judgment. [Record No. 53] Because the Court finds that venue is proper in this district, that the statute of limitation did not run, that *res judicata* is not applicable, that *Dixie Fuel Co. v. Comm'r of Social Security*, 171 F.3d 1052 (6th Cir.1999), is controlling in this circuit and that the Commissioner overstepped his authority in making the *Eastern Enterprises*[1] type reassignments, the Court will grant the Plaintiffs' Motion and will deny the Defendant's and the Intervenor–Defendants' Motions.

## I. BACKGROUND AND CASE SUMMARY

### A. The Coal Act

This case arises under the Coal Industry Retiree Health Benefit Act, 26 U.S.C. §§ 9701–9722, 30 U.S.C. § 1232(h) (the "Coal Act"). Over the past several decades, the Plaintiffs and other coal mine operators ("operators") collectively promised retirees and their dependents health benefits under a number of United Mine

---

**1.** *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998).

Worker collective wage agreements. In 1974, for the first time, some companies agreed to provide life-time health benefits for retirees. In 1978, the operators signed another agreement strengthening this benefit system. Over time, mine operators were unable to agree how to distribute their responsibility to pay for this joint promise to provide life-time health benefits to retirees. In response, Congress passed the Coal Act in October 1992, which contained a formula for allocating the responsibility to pay for these health benefits to operators.

The Coal Act provides for continuation of health benefits that the mine operators had promised but could not agree on how to finance. Under the Coal Act, the Social Security Administration ("SSA"), under the direction of the Social Security Commissioner (the "Commissioner"), assigns individual retirees and their dependents (collectively, the "beneficiaries") to operators that agreed to pay health benefits under the previous mine-wage agreements. Accordingly, an operator's financial liability varies with the number of "assignments" made by the Commissioner to the operator. For each beneficiary assigned to an operator, that operator is required to pay a "liability premium." Although the Commissioner was given the authority to make the assignments, the Trustees of the United Mine Workers of America Combined Benefit Fund (the "Trustees") were given responsibility to collect the premiums paid by the mine operators and for the oversight of the health benefit plan.

The Coal Act provided that the SSA was required to make all assignments before October 1, 1993. However, Congress did not appropriate funds for the SSA to conduct the enormous task of making assignments until July 1993, leaving only a few months to make all assignments.

## B. The Assignments

The Coal Act established the criteria for assignments. Title 26, U.S.C. § 9706, provides for two classes of beneficiaries: (1) those who could be assigned under the statutory scheme (the "assigned" beneficiaries) and (2) those who could not be assigned under the statutory scheme (the "unassigned" beneficiaries). In making assignment determinations, the Coal Act requires that Commissioner establish a priority list for each beneficiary of all of his previous employers that could be taken into account under scheme. He is to take into account both recency and length of employment of a miner with different companies and whether a company did or did not sign the 1978 agreement. 26 U.S.C. § 9706(a).

The Commissioner must ignore any employment during periods in which the employer was not a signatory to one of the coal wage agreements or in which the employer had gone out of business. 26 U.S.C. § 9706(b). The Commissioner then assigns the beneficiary to the operator with the highest priority. The statute does not explicitly permit the Commissioner to assign a beneficiary to anyone *other than* the operator with the highest priority. That is, the Commissioner could *only* assign a beneficiary to the operator with the highest priority

All unassigned beneficiaries would be given benefits, but that coverage would come from an over-funded UMW pension plan and from interest earned on the Mine Reclamation Fund. Additionally, 26 U.S.C. § 9706 provided for the review and "reassignment" of beneficiaries, should the Commissioner find that an assignment was made to the wrong operator. Operators were permitted to directly ask the Commissioner to review assignments and also seek judicial review of the Commissioner's assignment decisions. 26 U.S.C. § 9706(f).

The Commissioner was unable to complete the assignment of all beneficiaries prior to October 1, 1993. Thus, he continued making initial assignments to operators after this statutory deadline. However, in making the assignments, the Commissioner never communicated to an operator whether it was an initial assignment or a reassignment.[2] The Plaintiffs contest the validity of any assignments made on or after October 1, 1993, alleging those assignments were beyond the scope of the statutory scheme. Plaintiffs ask that those assignments be voided and those beneficiaries classified as "unassigned." [See Record No. 1, Counts I and II.]

## C. The *Eastern Enterprises* Decision

In 1998, the Supreme Court held in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), that while Congress intended that employers who had participated in the mine wage agreements as early as 1946 should be considered in making assignments, the necessary expectation of *life-time* benefits was not created until 1974. As such, companies that had left the system before 1974 could not be charged with contributing toward the health benefits under the Coal Act. As a result, those companies could not be assigned liability premiums for beneficiaries.

As a result of the *Eastern Enterprises* decision, the Commissioner re-examined assignments made to Eastern and companies that had not signed any agreement since 1974 ("Eastern Enterprises-type companies"). Since considering employment with these companies in making assignments was unconstitutional, the Commissioner *ignored* employment with Eastern Enterprises-type companies in

making the re-assignments, although the statute did not *expressly* permit this. Thus, the Commissioner classified any employment with Eastern Enterprises-type companies as employment outside the scope of the national wage agreements in making these reassignment and did not take that employment into account as "certain employment disregarded" under 26 U.S.C. § 9706(b)(1)(B). As a result, even if an Eastern Enterprises-type company had the highest priority, that company was disregarded and the beneficiary was assigned to the company with the *next* highest priority.

### D. The Plaintiffs

Plaintiff A.T. Massey Coal Co., Inc. ("Massey") is a Virginia mine operator. Massey is either the direct or indirect parent of all other named Plaintiffs, all of which are also mine operators. Massey received the great majority of the assignments being challenged herein with the remainder being made to Massey subsidiaries that are incorporated outside of Kentucky and have their principal place of business in another state. In the event of a default by Massey or one of the subsidiaries that had received assignments, the other subsidiaries (including the Kentucky operator-Plaintiffs) would be liable for those liability premiums as a related operator.

After the Supreme Court issued the *Eastern Enterprises* decision, Massey and several subsidiaries asked the Commissioner to void assignments made to them on the basis that they were a related person to a defunct company that had *not* signed a 1974 or later wage agreement. (See Plaintiffs' Opposition, p. 16.) The Commissioner responded that these com-

---

**2.** For further discussion of the facts underlying the Coal Act see *In re Blue Diamond Coal Co.*, 79 F.3d 516 (6th Cir.1996).

panies were not similarly situated to Eastern. Accordingly, in light of *Eastern Enterprises*, Massey and some of its non-Kentucky subsidiaries filed an action against the Commissioner in the Eastern District of Virginia on this issue. That lawsuit challenged 82 of the same assignments at issue in Counts I and II of the present action. *See A.T. Massey Coal Co., Inc. v. Massanari*, 153 F.Supp.2d 813 (E.D.Va.2001) (hereafter, *"Massey I"*). The district court in *Massey I* entered final judgment in favor of the Commissioner. That judgment is now on appeal before the Court of Appeals for the Fourth Circuit.

### E. The Plaintiffs' Claims

Plaintiffs bring this action contesting the validity of 303 assignments made on or after October 1, 1993, alleging such assignments are beyond the scope of statute. They ask that those assignments be voided and the respective beneficiaries be classified as "unassigned." The basis for these claims is *Dixie Fuel Co. v. Comm'r of Social Security*, 171 F.3d 1052 (6th Cir. 1999) (holding that any assignments after September 30, 1993, are outside the Commissioner's assigned authority under the Coal Act). These claims are presented in Counts I and II (the *"Dixie* claims"). Additionally, Plaintiffs assert that the Commissioner acted *ultra vires* in making the re-assignments in the light of *Eastern Enterprises*. That is, they argue that in making those reassignments, the Commissioner reassigned beneficiaries to the operator with the *next* highest priority which is *not* permitted under 26 U.S.C. § 9706. They allege that the Commissioner can only assign or reassign beneficiaries to the operator with the highest priority and, in light of *Eastern Enterprises*, if the Commissioner cannot assign beneficiaries to the highest priority operator, the beneficiaries should be classified as unassigned. These

claims are contained in Counts III and IV (the *"Eastern Enterprises* claims").

The Plaintiffs also ask for the a return of all premiums wrongfully held, restitution, and a credit for those premiums paid but not returned. [See Record No. 45, Counts V, VI, and VII.] The Trustees intervened as Defendants after the action was filed. (See Record Nos. 14, 27.) Plaintiffs have filed a Motion for Summary Judgment regarding both the *Dixie* and the *Eastern Enterprises* claims. [See Record No. 34.]

### F. The Defendants' Motions

Subsequently, the Commissioner brought a Motion to Transfer, or, in the Alternative, for Summary Judgment. [Record No. 48] The Intervenor–Defendant Trustees filed a corresponding Motion for Summary Judgment. [Record No. 54] First, the Commissioner argues that venue in this district is improper and requests that the case be transferred. Next, he requests summary judgment on his statute of limitations defense. Further, both the Commissioner and the Trustees allege that the decision in *Massey I* should act as *res judicata* and claim preclusion to bar part of Plaintiffs' *Dixie* claims. Finally, both Defendants request summary judgment on the *Dixie* and *Eastern Enterprises* claims.

The issue raised by the Commissioner in the request for transfer/improper venue is now on appeal before the Sixth Circuit in *Mead Corp. v. Massanari* from the Southern District of Ohio (*appeal docketed* 01–3277 (6th Cir.2001)). That issue concerns whether the statutory language in 28 U.S.C. § 1391(e)(3) (the federal venue statue) regarding the residency of "the plaintiff" should be interpreted to mean when *any* plaintiff resides in a district or when *all* plaintiffs reside in a district. [Record No. 48, p. 3, fn. 3] Although fully briefed,

that case has not yet been scheduled for oral argument.

Additionally, the issue raised in the *Dixie* claims (whether initial assignments made after September 30, 1993, are void) is expected to be reviewed by the Supreme Court in two other cases: *Barnhart v. Peabody Coal Co.* (U.S. Supreme Court, Case No. 01–705) and *Holland v. Bellaire Corp.* (U.S. Supreme Court, Case No. 01–715) (consolidated for argument with 01–705). Certiorari was granted in these cases on January 22, 2002. [See Record No. 64.] It appears that the Supreme Court will not likely issue a decision on that issue until some time in 2003.

## II. THE COMMISSIONER'S MOTION TO TRANSFER WILL BE DENIED AS VENUE IS PROPER IN THIS DISTRICT

### A. The Federal Venue Statute—28 U.S.C. § 1391(e)(3)

The Commissioner requests a transfer of venue, alleging that this district is not a proper venue under any of the different choices Congress provided in 28 U.S.C. § 1391(e). This statute governs actions brought against the United States or one of its agencies or officers to challenge administrative action, like the one at hand.

Extensive changes were made to this statute in 1966 under the Mandamus and Venue Act of 1966 "to broaden the venue of civil actions which could previously have been brought only in the District of Columbia." *Schlanger v. Seamans,* 401 U.S. 487, 490 n. 4, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971) *quoting* H.R.Rep. No. 536, 87th Cong., 1st Sess., 1; S.Rep.No.1992, 87th Cong., 2d Sess., 2. Under the Judicial Improvements and Access to Justice Act of 1988 and the Judicial Improvement Act of 1990, Congress again made changes broadening the venue of the courts. As a result of these extensive alterations, parts of the statute left materially unchanged should

be assumed to have effectively the same intention—to broaden the venue of district courts. *See First of Michigan Corp. v. Bramlet,* 141 F.3d 260, 263 n. 3 (6th Cir. 1998) (finding "the amended statutory language was the result of a recommendation by the Federal Courts Study Committee to broaden transactional venue in order to avoid excessive litigation over venue"); *Winnebago Tribe of Nebraska v. Babbitt,* 915 F.Supp. 157, 163 (D.S.D.1996) (holding "amended venue statute was intended to expand the number of venues available to a plaintiff"); *see also Report of the Federal Courts Study Committee* at 94 (1990); John B. Oakley, *Recent Statutory Changes in the Law of Federal Jurisdiction and Venue,* 24 U.C. Davis L.Rev. 735, 782 n. 62 (Spring 1991); Siegel, *Changes in Federal Jurisdiction and Practice under the New Judicial Improvements and Access to Justice Act,* 123 F.R.D. 399, 402 (1989).

The amended statute states, in part, that:

(e) A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action.

28 U.S.C. 1391(e) ("the venue statute"). Thus, actions governed under subsection (e) may be brought in any district in which a defendant in the action resides, where a substantial part of the events or omissions giving rise to the claim occurred or where the plaintiff resides (if no real property is

involved). 28 U.S.C. § 1391(e); *see* 15 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure* §§ 1107, 3807–3815 (2d ed.1986); 9 A.L.R. Fed. 719 (1971). It is not alleged that venue is conferred upon this Court under the first two paragraphs of subsection (e). Instead, the issue here involves the latter paragraph and will be examined below.

### B. The Parties' Arguments

The Commissioner argues that the Plaintiffs chose this venue merely to take advantage of the favorable precedent established in *Dixie Fuel Co. v. Comm'r of Social Security*, 171 F.3d 1052 (6th Cir. 1999). He points out that other jurisdictions have not adopted the rationale set forth in *Dixie*. As a result, other venues are not as favorable to the Plaintiffs' case. The Commissioner alleges that neither Massey nor any of Massey's subsidiaries that received the assignments in question reside in Kentucky. Instead, he avers that the Kentucky corporations named as Plaintiffs did not receive assignments and that they are liable for the other plaintiff's assignments only in theory. *See* 26 U.S.C. § 9704(a). Further, he asserts that in *Massey I*, Massey did not join its Kentucky subsidiaries and, therefore, it did not need to manufacture venue in Kentucky as alleged here. Consequently, he argues there is no reason to join them in this case.

The basis for the Commissioner's argument relies on a specific statutory interpretation of § 1391(e)(3). He asserts that, although venue can be proper where "the plaintiff" resides, it is not enough that some plaintiffs reside here. The plaintiff must reside in the district to invoke that alternative basis for venue, and that means each plaintiff, not any plaintiff. [Record No. 48, p. 3] Thus, the issue presented in the request for transfer is whether, under subsection (e) of the venue statute, venue exists only where *any* plaintiff resides [3] or only where *all* plaintiffs reside. [Record No. 48, p. 17–18.]

In support of this argument, the Commissioner alleges that this Court should follow *Smith v. Lyon*, 133 U.S. 315, 10 S.Ct. 303, 33 L.Ed. 635 (1890), the logic in footnote 20 in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 156, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and the difference between the words "the" and "a" in interpreting the statute.

In *Smith*, the Supreme Court examined the proper construction of the first section of the act of congress [sic] approved March 3, 1887, (24 St. 552,) as amended by the act of August 13, 1888, (25 St. 433.) That statute professes to be an act to amend the act of March 3, 1875, and its object is "to determine the jurisdiction of circuit courts of the United States, and to regulate the removal of causes from state courts, and for other purposes."

*Id.* at 316, 10 S.Ct. 303. The Court held that where jurisdiction of the federal courts "is founded only on the fact that the action is between citizens of different states, suit shall be brought only in the district of the residence of either the plaintiff or the defendant." Thus, under *Smith*, the district in which one of two plaintiffs and the defendant are nonresidents would

---

**3.** The Commissioner argues that to even get this far in the analysis, Plaintiffs would need to show that "Massey or the directly assigned subsidiaries might some day not be able to pay the premiums." His underlying assertion is that the plaintiffs who reside in Kentucky are redundant and that it is unlikely that they would not be able to pay the assess premiums. However, the present issue is the precise meaning of "the plaintiff" as used in 28 U.S.C. 1391(e)(3), not whether the Kentucky Plaintiffs would be required or able to pay premiums owed by the non-Kentucky Plaintiffs.

not have jurisdiction of the suit because federal court's jurisdiction would exist only where *all* plaintiffs reside. *Id.*

However, much has changed since the Court's ruling in *Smith.*

> [W]hen *Smith* was decided, nearly one hundred years ago, the venue statute in effect today did not exist. In 1890, venue in a diversity case was appropriate only where all plaintiffs or all defendants resided. In 1966, to cure the problem created where the residences of co-plaintiffs or co-defendants made the proper laying of venue impossible, a venue statute providing for commencement of an action in the district where the claim arose was passed. *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.,* 406 U.S. 706, 710 n. 8, 92 S.Ct. 1936, 32 L.Ed.2d 428 (1972). Since the enactment of that statute, dismissal is not necessarily required where venue cannot be premised on the parties' citizenship. Defendants also fail to realize that Smith was decided prior to the enactment of 28 U.S.C. § 1406 ("Section 1406"). That section gives district courts discretion to either dismiss an improperly venued case or "if it be in the interest of justice" to transfer such case to any district or division in which the case could have been commenced. *See* 28 U.S.C. § 1406(a).

*Zumft v. Doney Slate Co.,* 698 F.Supp. 444, 446 (E.D.N.Y.1988). This Court agrees that the statute examined in *Smith* is not the venue statue in effect today.

The Commissioner also cites *Abbott,* 387 U.S. 136, 87 S.Ct. 1507, for the proposition that "the Supreme Court has assumed that a party cannot obtain venue under this provision merely because a co-plaintiff resides in this district." [Record No. 48, p. 18] However, in *Abbott,* the Supreme Court specifically dismissed its writ of certiorari regarding this issue. *Id.* at 156, n. 20, 87 S.Ct. 1507. Therefore, the argu-

ments relying on *Smith* and *Abbott* are not relevant in examining the venue question presented here.

Turning to heart of the argument (*i.e.,* whether the words "the plaintiff" in the statute means "all plaintiffs"), the Commissioner asserts that "Congress allowed an action to be brought where 'the plaintiff,' not merely 'a' or 'any' plaintiff, resides." [Record No. 48, p. 18] He asserts that Congress could have used the words "a" or "any," and that Congress' contemporaneous use of different language in other paragraphs of § 1391(e) strongly suggests that Congress knew the difference between these words and chose "the" deliberately. [Record No. 48, p. 19] He relies on *Smith,* again, and the Revision Notes to the statute as support for his argument. However, as noted above, *Smith* no longer provides authority with respect to this issue.

The Commissioner refers to the Revision Notes for the principles that "[r]eference to 'all plaintiffs' and 'all defendants' were substituted for references to 'the plaintiff' and 'the defendant' in view of the many decisions holding that the singular terms were used in the collective nature." 28 U.S.C. § 1391, Revision Notes and Legislative Reports, 1948 Acts, ¶ 7, *citing Smith,* 133 U.S. 315, 10 S.Ct. 303; *Hooe v. Jamieson,* 166 U.S. 395, 17 S.Ct. 596, 41 L.Ed. 1049 (1897); *Fetzer v. Livermore,* 15 F.2d 462 (S.D.Fla.1926). However, as indicated previously, the venue statute at issue here was overhauled in 1966 (*see Zumft,* 698 F.Supp. at 446) and again in 1988 and 1990. See section II(A), *supra,* and *Schlanger,* 401 U.S. 487, 91 S.Ct. 995. Thus, the 1948 Acts' Revision Notes are, in a word, outdated.

Next, lacking any recent case precedent to bolster his assertions, the Commissioner turns to legislative history. He asserts that "the provision's legislative history

shows that Congress rejected language allowing suit where any plaintiff resides and replaced it with language that the courts had consistently read as applying only when all plaintiffs reside in the district." [Record No. 48, p. 20] Yet, contrary to this position, Plaintiffs note the "number of lower courts, beginning with and then following *Exxon Corp. v. FTC*, 588 F.2d 895 (3rd Cir.1978), [that] have interpreted 29 U.S.C. § 1391(e)(3) as if it said 'any' plaintiff, and have thus allowed plaintiffs to pick and choose any district in which any of them resides." [See Record No. 48, p. 18.][4]

The Commissioner argues that *Exxon* and its progeny "do not confront or even acknowledge Congress' choice of language with a previously established judicial meaning ... and contain little analysis beyond a conclusory statement that reading 'the plaintiff' to mean 'each plaintiff' would 'result in an unnecessary multiplicity of litigation.'" [See Record No. 48, p. 20, *citing Exxon*, 588 F.2d at 898.] Consequently, the Commissioner argues that the *Exxon* construction does not avoid undue multiplicity of litigation and does nothing to assure that different plaintiffs with similar claims will join their claims. [Record No. 48, p. 21] The Commissioner concludes that the statute should be interpreted as he alleges Congress intended and that the Plaintiffs' attempt to base venue on the residence of "any plaintiff" rather than "all

plaintiffs" should be rejected. Thus, he requests that this case should be transferred to a district where venue is proper[5] *or* dismissed for improper venue.

Plaintiffs counter that under § 1391(e)(3) venue properly attaches where only one plaintiff is a resident of the forum district. They assert that the Commissioner's argument is "without merit as a matter of statutory construction and statutory history, and has properly and persuasively been rejected in an unbroken chain of persuasive court rulings back to 1971." [Record No. 57, p. 32] They cite *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000), in support of their assertion that the wording of the statute is permissive rather than restrictive.[6]

Further, and more persuasively, Plaintiffs argue that no court "has ever endorsed the restrictive reading of the general federal venue statute the Commissioner now invites this Court to adopt." [Record No. 57, p. 33] Plaintiffs cite numerous cases and several treatises in support of their assertion that, where multiple plaintiffs sue a federal officer or agency under § 1391(e)(3), venue is properly laid in any district in which *any* one of the plaintiffs reside. [See Record No. 57, pp. 33–34, n. 28.] All of these cases (and corresponding treatises) deal with the statute as amended since 1966 *not* the 19th Century statute inter-

---

4. The Court notes two additional points. First, this issue is now before the Sixth Circuit in *Mead Corp., et. al. v. Massanari*, et. al., No. 01–3277 (6th Cir.). Though fully briefed, this case has not yet been scheduled for oral argument. As a result, this Court believes it should determine this issue in a timely manner, rather than wait for the Sixth Circuit to rule on it. Second, as will be discussed below, the Commissioner is incorrect in stating that *Exxon* was the first case to rule on this issue. *See* section II(c).

5. The Commissioner requests that this matter be transferred to Washington D.C. since, pursuant to 28 U.S.C. § 1391(e)(3), Washington is also a proper venue and is a location where counsel for the litigants are located.

6. "Attention to practical consequences thus points away from the restrictive reading of §§ 9–11 and confirms the view that the liberalizing effect of the provisions in the day of their enactment was meant to endure through treating them as permitting, not limiting, venue choice today." *Cortez,* at 203–04, 120 S.Ct. 1331.

preted by cases upon which the Commissioner relies. Plaintiffs assert that, even in face of uniform case law supporting Plaintiff's position, Congress overhauled the venue rules and provisions without making any change to the plaintiff residency language. [Record No. 57, p. 36.]

In response to the Plaintiffs' overwhelming recitation of cases, the Commissioner replies that "[i]t is a daunting task ... to disagree with so many distinguished authorities." [Record No. 57, p. 2.][7] However, the Commissioner asks this Court to take a "fresh look" at the statute, even in the face of a the plethora of well-established law. The Commissioner returns to his previous arguments regarding Congressional intent and statutory interpretation. [Record No. 57, pp. 2–5.] He concludes that "cases decided *before* enactment [of the current venue provision] are in this instance even more important." [Record No. 57, p. 5.]

C. The Court Will Deny The Motion To Transfer Based On The Overwhelming Body Of Law Addressing The Issue.

 The role of the judiciary often involves the interpretation of contested statutory meanings. The case at hand involves one of these issues: whether the statutory language in 28 U.S.C. § 1391(e)(3) regarding the residency of "the plaintiff" should be interpreted to mean *all* plaintiffs or *any* plaintiff. Although the Commissioner requests this Court to take a "fresh look" at this issue, the Court declines this invitation on the grounds that the overwhelming authority established by a long list of cases conclusively decides this issue.[8]

In addition, the Court finds the Plaintiffs' arguments compelling. As one of the leading treatises on federal practice and procedure states:

[t]his portion of the statute speaks "the plaintiff." Older cases construing similar language in former venue statute [sic] had construed those words to mean "all plaintiffs" in cases with multiple parties, and it has been suggested that Congress should change "the plaintiff" to "a plaintiff." Congress has not made such a change, but it is unnecessary, because the courts have read the statute as if the change had been made and have held that only one plaintiff need satisfy the residency requirement.

15 Charles A. Wright, Arthur R. Miller and Edward H. Cooper, *Federal Practice and Procedure*, § 3815 (2d ed.1986). Indeed, this is not only the majority view—it is the *only* view adopted by the federal courts since 1971.[9] Over fifteen district

---

7. The law regarding this issue has been clearly established for 30 years by a large number of cases. As will be discussed more in-depth, *infra*, this is indeed a "daunting task" for the Commissioner.

8. Even if this Court believed the Commissioner's arguments to be meritorious, which it does not, the primary role of the district court is to apply clearly established federal law, not to engage in independent statutory interpretation. *See generally*, Hart & Wechsler, *The Federal Courts and the Federal System*, 1–63 (1973); Frank, *Historical Bases of the Federal Judicial System*, 13 Law & Contemp. Probs. 3 (1948).

9. This rule was enunciated or followed in: *Mead Corp. v. Comm'r of Social Security*, No. C2–99–818 (S.D.Ohio Nov.17, 2000), *appeal docketed*, No. 01–3377 (6th Cir.2001); *Favereau v. U.S.*, 44 F.Supp.2d 68 (D.Me.1999); *Minn–Dak Farmers Co-op. v. Espy*, 851 F.Supp. 1423 (D.N.D.1994); Aug. 12 order filed in *NCA v. Shalala*, No. CV 94–H–0780–S (N.D.Ala.1994); *Finley v. Nat'l Endowment for the Arts*, 795 F.Supp. 1457 (C.D.Cal.1992), *aff'd* 100 F.3d 671 (9th Cir.1996), *cert. granted*, 522 U.S. 991, 118 S.Ct. 554, 139 L.Ed.2d 396 (1997), *rev'd and remanded on other grounds by* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998); *Ry. Labor Executives' Ass'n v. ICC*, 958 F.2d 252 (9th Cir.1991); *Nat'l Air Traffic Controllers Ass'n v. Burnley*,

courts in ten different circuits have consistently ruled against the Commissioner's arguments. Three of these districts, Michigan, Ohio and Tennessee, are in this Circuit. And although the Sixth Circuit has not ruled on this issue yet, it is pending before this Circuit in *Mead Corp. v. Massanari,* (appeal docketed 01–3277) (6th Cir.2001).

The only case that even intimates a different decision is *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army,* 325 F.Supp. 728 (E.D.Ark.1971), *supp. by* 325 F.Supp. 749 (E.D.Ark.1971), *aff'd* 470 F.2d 289 (8th Cir.1972), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). "The Court can think of on [sic] objective which the Congress might have had in limiting 1391(e)[ (3) ] to either single-plaintiff cases or to only those multiple-plaintiff cases where all of such plaintiffs reside in the judicial district of the forum." *Id.* at 732. However, *Envtl. Def. Fund* was decided in 1970, and no subsequent case, except one, has even intimidated a different result than this Court reaches. *See Kings County Economic Community Development Ass'n v. Hardin,* 333 F.Supp. 1302 (D.C.Cal.1971) ("The Court has found no case law or scholarly comment on the ambiguity of § 1391(e), and none has been cited by the parties.")

In fact, the Commissioner fails to cite a single case since this statute was amended in 1966 to support his position. As a result, he turns to cases that examine statutes no longer in effect. Clearly, Congress' intent was to provide plaintiffs with more options with respect to venue in a case against a government agency. To transfer this case to Washington D.C. would contravene Congress' intent. Indeed, the litigation surrounding this issue contravenes the recommendations by the Federal Courts Study Committee. *See Bromlet, supra.*

Thus, under 28 U.S.C. § 1391(e), this Court concludes that a suit can be brought in a district in which a single plaintiff resides. While the Defendants urge the Court to interpret the statute differently, the fact remains that the case law supports the Plaintiffs' contention that the statute only requires one plaintiff to reside in the selected district. Accordingly, since at least one Plaintiff is a residence of this district, venue is proper in this Court.

700 F.Supp. 1043 (N.D.Cal.1988); *Jewish War Veterans v. U.S.,* 695 F.Supp. 1 (D.D.C. 1987); *Nat'l Treasury Employees Union v. Von Raab,* 649 F.Supp. 380 (E.D.La.1986), *vacated on the merits,* 816 F.2d 170 (5th Cir.1987); *Santa Fe Int'l Corp. v. Watt,* 580 F.Supp. 27 (D.Del.1984); *Amoco Prod. Co. v. Dept. of Energy,* 469 F.Supp. 236 (D.Del.1979); *Columbia Power Trades Council v. Dept. of Energy,* 496 F.Supp. 186 (W.D.Wash.1980), *vacated and remanded for want of subject matter jurisdiction,* 671 F.2d 325 (9th Cir.1982); *Nat'l Distillers and Chemical Corp. v. Dept. of Energy,* 487 F.Supp. 34 (D.Del.1980); *Standard Oil v. FTC,* No. H 78–485, 1979 WL 1605 (N.D.Ind. March 28, 1979); *Wearly v. Federal Trade Comm'n,* 462 F.Supp. 589 (D.N.J.1978); *American Motors Corp. v. FTC,* No. 8–72335 (E.D.Mich. Nov 15, 1978 slip op.); *Dow Chemical, USA v. Consumer Prod. Safety Comm'n,* 459 F.Supp. 378 (W.D.La.1978), *on rehearing* 464 F.Supp. 904 (W.D.La.1979); *Exxon,* 588 F.2d 895; *Kenyatta v. Kelley,* 430 F.Supp. 1328 (E.D.Pa.1977); *Folk Const. Co. v. Dept. of Army of the U.S.,* No. C76–18, 1976 WL 1667 (W.D.Tenn. Feb.2 1976); *Kahane v. U.S.,* 396 F.Supp. 687 (E.D.N.Y.1975), *order modified* 527 F.2d 492 (2nd Cir.1975); *Candarini v. Attorney Gen. of U.S.,* 369 F.Supp. 1132 (E.D.N.Y.1974); *Holtzman v. Richardson,* 361 F.Supp. 544 (E.D.N.Y.1973), *rev'd on other grounds sub. nom. Holtzman v. Schlesinger,* 484 F.2d 1307 (2nd Cir.1973), *cert. denied* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); *Natural Res. Def. Council, Inc. v. TVA,* 340 F.Supp. 400 (S.D.N.Y.1971), *rev'd on other grounds,* 459 F.2d 255 (2nd Cir. 1972); *See* 9 A.L.R. Fed. 719 (pocket part) (1971); *Wright, supra,* §§ 1107, 3807–3815.

## III. THE MOTIONS FOR SUMMARY JUDGMENT

### A. The Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. That is the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Keeneland Ass'n, Inc. v. Eamer,* 830 F.Supp. 974, 984 (E.D.Ky.1993) *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In making this determination, the Court must review all the facts and the inferences drawn from those facts in the light most favorable to the nonmoving party. *Matsushita,* at 587, 106 S.Ct. 1348. When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita,* at 587, 106 S.Ct. 1348.

In the instant action, no factual disputes exist. Rather, as the issues raised by the parties can be decided as a matter of law, the Court will rule on them accordingly.

### B. The Statute Of Limitations Did Not Run Under 29 U.S.C. § 1451(f) Before The Plaintiffs Filed The Instant Action.

■ The Commissioner alleges that 26 of the 303 *Dixie* claims are barred by the statute of limitations.[10] He asserts that 28 U.S.C. § 2401(a) (generally governing review of decisions by an administrative agency) should control the disposition of this case. That statute provides that actions for review of an administrative agency must generally be brought within six years. *Sierra Club v. Slater,* 120 F.3d 623 (6th Cir.1997). He argues that Massey "is not entitled to take more than seven years to challenge assignments for being merely seven days too late." [Record No. 48, p. 28] As such, he argues that Massey is not entitled to challenge these twenty-six assignments.

The Plaintiffs respond that the Coal Act *specifically* states that 29 U.S.C. § 1451 (an ERISA statute of limitations section) is applicable. 26 U.S.C. § 9721, governing Civil Enforcement of a Coal Act claim, provides that,

> [t]he provisions of section 4301 of [ERISA] shall apply to any claim arising out of an obligation to pay any amount required to be paid by this chapter in the same manner as any claim arising out of an obligation to pay withdrawal liability under subtitle E of title IV of such Act.

*Id.*[11]

---

10. The Plaintiffs admit receiving these twenty-six contested assignments before March 2, 1995, more than six years before the filing of this action. [See Record No. 48, p. 28.]

11. In his Reply, the Commissioner argues "Section 1451(f) does not apply, since it is part of ERISA, which does not waive sovereign immunity for actions against agencies of the United States." [Record No. 61, p. 11, n.

Section 4301 of ERISA, as codified in 29 U.S.C. § 1451(f), states:

> [a]n action under this section may not be brought after the later of—(1) 6 years after the date on which the cause of action arose, or (2) 3 years after the earliest date on which the plaintiff acquired or should have acquired actual knowledge of the existence of such cause of action; except that in the case of fraud or concealment, such action may be brought not later than 6 years after the date of discovery of the existence of such cause of action.

29 U.S.C. § 1451(f).

■ The difference between the two statutes significantly affects the beginning of the time period by which the statute of limitations determination would be made. Thus, this Court finds the Plaintiffs' argument meritorious. The Coal Act specifically states that 29 U.S.C. § 1451 is controlling. Thus, the statute of limitations will begin to run the *later* of six years after the date on which the cause of action arose or three years after the earliest date on which the Plaintiffs acquired or should have acquired actual knowledge of the existence of such cause of action.

The Commissioner claims that, under the discovery rule, the statute begins to run when the injury is discovered, "not whatever additional facts must be proved for a party to know that the injury is wrongful or actionable." [Record No. 48, p. 29] [12] He alleges that *Amini v. Oberlin College*, 259 F.3d 493, 500 (6th Cir.2001) states the proper discovery rule: "[a] plaintiff's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful." He argues this rule mandates that the discovery of the injury (here, the assigning of the beneficiaries to the Plaintiffs *after*

September 30, 1993) is the cause of *and* the corresponding discovery of the injury. He also argues that the Supreme Court's decision in *Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000), is controlling: "in applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of the claim, is what starts the clock." *Id.* at 555, 120 S.Ct. 1075.

Plaintiffs counter that they did not know or suspect that the Commissioner was acting *ultra vires* when he made these 26 assignments. They further contend that the Commissioner never informed them that the assignments were actually initial assignments. They argue that, under the discovery rule, the limitations period did not begin to run until they discovered that the Commissioner had, in light of *Dixie*, made unauthorized assignments. Basically, this amounts to a claim that the discovery of the injury did not arise until the Sixth Circuit handed down its ruling in *Dixie* in 1999.

■ Generally, under the discovery rule, a statute of limitations begins to run when a party discovers that he has been injured or when he knows or should know of his injury. *Ruff v. Runyon*, 258 F.3d 498, 501 (6th Cir.2001); *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir.1991); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir.1984); *Keating v. Carey*, 706 F.2d 377, 382 (2nd Cir.1983); *See* 19 Wright, *Federal Practice & Procedure: Jurisdiction* § 4509 (2d ed.1996). However, the discovery rule is only appropriate when a statute is silent on the issue. Otherwise, a federal court must follow a statute if it establishes a time of accrual. *Rotella v. Wood*, 528 U.S. 549, 555, 120 S.Ct.

---

6] However, the statute *clearly* rebuts this argument.

**12.** The Trustees agree with and adopt the Commissioner's statute of limitations argument. [See Record No. 54, p. 3, n. 4.]

1075, 145 L.Ed.2d 1047 (2000); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 191, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), *citing Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 342 (D.C.Cir.1991); 1C Corman, *Limitation of Actions* § 6.5.5.1, p. 449 (1991).

Here, 29 U.S.C. § 1451(f)(1) and (2) both state that the statue of limitations begins to run when the "cause of action" arises. *Id.* A "cause of action" is certainly different than an "injury." "Cause of action" is

> difficult of precise definition, perhaps best defined as the fact or facts which establish or give rise to a right of action, in other words, give to a person a right to *judicial relief.* [It is the] right which a party has to institute judicial proceedings ...[which] is the operative fact or facts which give right to a right of action ... concerned with the *violation* of a right.

*Ballentine's Law Dictionary*, p. 182 (3d ed.1969) (emphasis added). This term has also been defined as:

> (1) [a] group of operative facts giving rise to one or more *bases for suing;* a factual situation that entitles one person to obtain a *remedy in court* from another person ... (2)[a] *legal theory* of a lawsuit.

*Black's Law Dictionary*, p. 214 (7th ed.1999) (emphasis added); *see U.S. v. Memphis Cotton Oil Co.*, 288 U.S. 62, 68, 53 S.Ct. 278, 77 L.Ed. 619 (1933).

An injury, on the other hand, is the "invasion of a *legal right*," *Ballentines's, supra,* at 627 (emphasis added), the "violation of another's *legal right,* for which the law provides a remedy." *Black's Law, supra,* p. 789 (emphasis added), or "[a]ny wrong or damage done to another." *Black's Law,* p. 924 (4th ed.1968). The

*Restatement (Second) of Torts* § 7 (1965) comment defines "injury" as "the invasion of any *legally protected interest* of another." (emphasis added) Furthermore, in determining the existence of an "injury," the "inquiry focuses on the *harm* incurred, rather than the plaintiff's knowledge of the underlying facts which gave rise to the harm." *Friedman,* at 1159 (emphasis added), *citing Shannon v. Recording Indus. Ass'n of Amer.,* 661 F.Supp. 205, 210 (S.D.Ohio 1987).[13]

In *Shamaeizadeh v. Cunigan,* 182 F.3d 391 (6th Cir.1999), the Sixth Circuit held that a plaintiff's alleged § 1983 claims based on an illegal search did not begin to run *until* the underlying criminal charges were dismissed. The court noted that "[u]ntil such time [as the charges are dismissed], a cause of action under § 1983 for damages is not cognizable." *Id.* at 501, *citing, Heck v. Humphrey,* 512 U.S. 477, 486, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Similarly, in *Ruff,* 258 F.3d 498, the Sixth Circuit followed its analysis in *Shamaeizadeh,* and held that the "plaintiffs' claims did not accrue until the charges against plaintiffs were finally dismissed because prior to that point in time, plaintiffs did not 'know' of their injury for purposes of the statute of limitations." *Ruff,* at 502. The cause of action did not accrue in those cases until the plaintiffs had a cognizable legal claim.

■ Additionally, what constitutes an "injury" is not as clear as the Commissioner alleges. Although this case is easily decided upon the plain language of the statute, even under the discovery rule an injury is not cognizable until there is an "invasion of a legally protected interest." *See* discussion, *supra.* From the forego-

---

**13.** The Commissioner argues that the assignments are the injury *and* the discovery of the injury. Without reaching the merits of this argument, it *might* be that the assignments were merely the *harm, not* the injury, as Plaintiffs' rights in this matter were not yet protected under *Dixie.*

ing, this Court finds that "cause of action," as used in 29 U.S.C. § 1451(f)(1)-(2), means when a party becomes or should become aware of the invasion of a legally protected interest *and* his corresponding right to judicial relief, which requires more than just being harmed.

This determination is consistent with cases from Kentucky's highest court that have examined the discovery rule in various situations.[14] In *Meade County Bank v. Wheatley*, 910 S.W.2d 233 (Ky.1995), the court examined a negligence action on a mortgage lien on certain real property and held that the statute of limitations did not being to run until there was a negligent act *and* a legally cognizable cause of action. The cause of action did not accrue until the "damages occasioned by the legal negligence became *fixed and non-speculative.*" *Id.* at 234 (emphasis added). Similarly, in *Wiseman v. Alliant Hospitals, Inc.*, 37 S.W.3d 709 (Ky.2000), the Court found that the difference between "harm" and "injury" was controlling. The court held that an "injury," for the purposes of construing the discovery rule, did not begin until the date of active or constructive knowledge of the "invasion of a *legally protected interest.*" *Id.* at 712 (emphasis added).

In the instant case, although Plaintiffs' were harmed in 1993 by the issuance of assignments to them, they did not have a legally protected interest until *Dixie* was handed down by the Sixth Circuit in 1999. As such, they were not entitled to judicial relief and did not have a cause of action until that time. Under the limitations in 29 U.S.C. § 1451(f), the Court concludes that the Plaintiffs filed suit well before the statute of limitations expired.[15] Accordingly, the Commissioner's Motion for Summary Judgment on the twenty-six cases allegedly barred by the statue of limitations defense will be denied.

**C. Res Judicata Is Not Applicable In The Instant Action Because The Parties Did Not Expect The Instant Claims Would Not Have Made A Convenient Trial Unit With Those Brought In *Massey I*.**

■ The Commissioner and the Trustees argue the ruling in *Massey I* should bar all attacks on the pre–1999 claims found in Counts I and II, and Counts V, VI and VII insofar as they relate to the claims in Counts I and II, by *res judicata* or claim preclusion.[16] [See Record No. 54, p. 12; Record No. 48, p. 22.][17] Conversely, the Plaintiffs claim that *Massey I* decided a very narrow issue not raised by their alleged causes of action. [Record No. 57, p. 19]

---

14. The Court again notes that the statute of limitations in this case is determined by federal law. *See Wilson v. Garcia*, 471 U.S. 261, 268–71, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). However, the analysis from the following Kentucky cases, though not dispositive, leads credence to the analysis conducted herein.

15. The two years between the decision in *Dixie* and the filing of this suit in March 2001, clearly falls within the statute's time limitations.

16. The Trustees note that, the term "res judicata" is traditionally used to describe two discrete effects—what is now called claim preclusion and issue preclusion, long called *collateral estoppel*. *See Baker v. General Motors Corp.*, 522 U.S. 222, 233 n. 5, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). The Sixth Circuit has referred to claim preclusion as "true res judicata." *J.Z.G. Resources, Inc.*, 84 F.3d at 214. [Record No. 54, p. 11, n. 8] This Court will use the terms *"res judicata"* and "claim preclusion" interchangeably although all such references mean "claim preclusion."

17. The Commissioner does not contend that the *Eastern* claims are so barred. [Record No. 48, p. 25–26, n. 18]

■ Under the doctrine of *res judicata*, when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1876); Restatement (Second) Judgments § 24 (1982); *see also J.Z.G. Resources, Inc. v. Shelby Ins. Co.*, 84 F.3d 211, 214 (6th Cir.1996) ("The general rule of claim preclusion, or true res judicata, is that a valid and final judgment on a claim precludes a second action on that claim or any part of it.")

■ The Sixth Circuit has clearly articulated that the doctrine of claim preclusion will operate to effectively bar a claim if the following four elements are present: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in a subsequent action which should have been litigated in the prior action; and (4) an identity of the causes of action. *Becherer v. Merrill Lynch*, 193 F.3d 415, 422 (6th Cir.1999) (en banc). Examining these elements in turn, the Court concludes that *res judicata* is not applicable in this case.

1. *Massy I* involved a final judgment by a court of competent jurisdiction.

■ First, a final judgment was entered in *Massey I*. Plaintiffs chose that forum and that court had jurisdiction to hear the claims in *Massey I*. Thus, that court was one of competent jurisdiction. [See Record No. 48, Ex. 5; Record No. 54, p. 12; Record No. 57, p. 17; Record No. 61, p. 2.] The pending appeal of the district court's judgment in *Massey I* does not deprive that judgment of *res judicata* effect. *See Smith v. S.E.C.*, 129 F.3d 356, 362 n. 7 (6th Cir.1997); *Commodities Export Co. v. U.S. Customs Serv.*, 957 F.2d 223, 228 (6th Cir.1992); *Restatement (Second) of Judgments* § 13, comment. f (1982); 18C Wright, C. Miller, A., & Cooper, E., *Federal Practice and Procedure* § 308 (2d ed.1981). Since the Plaintiffs do not contest the facts which support this element, the Court concludes that *Massey I* was a final decision on the merits by a court of competent jurisdiction.

2. The same parties or their privies are involved in both the instant action and in *Massey I*.

Next, the Defendants and the Trustees assert that this action involves "the same parties or their privies" that were involved in *Massey I*.[18] That case involved three of the plaintiffs in the instant action and two parties not before the court in this case. [See Record No. 54, p. 13; Record No. 57, p. 15, n. 14.][19] However, all of the companies involved as Plaintiffs in the present action are in direct privity with the plaintiff companies in *Massey I*. [Record No. 48, p. 2; Record No. 54, pp. 13–14; Record No. 57, p. 15, n. 14]; *see Sanders Confectionery Products, Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 480 (6th Cir.1992), *cert.*

18. The Plaintiffs do not explicitly allege that this is not "a subsequent action between the same parties or their privies." However, their assertion that not *all* of the same parties might be construed that way. The Court must view the facts in light most favorable to the non-moving party (i.e., the Plaintiffs), when making a summary judgment determination.

19. A.T. Massey Coal Company, Peerless Eagle Coal Company and Tennessee Consolidated Coal Company are the parties involved in both actions. Massey Coal Services, Inc. and Belfry Coal Corporation were also plaintiffs in *Massey I*, but they are not involved here.

*denied* 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993) (holding direct and indirect subsidiaries are in privity with corporate parent); 26 U.S.C. §§ 9701(c) and 9706(a) and (b) (stating related persons under the Coal Act include any operator in a controlled group of corporations).

Additionally, the Commissioner is a defendant in both cases. The Trustees were a counter claimant plaintiff in *Massey I* and are Intervenor–Defendants in this case. [Record No. 48, p. 24] Accordingly, the Court finds the instant action is a subsequent action between the same parties or their privies as in *Massey I.*

3. The Plaintiffs could have raised the *Dixie I* claims in *Massey I.*

Third, the Commissioner alleges that "the issue plaintiffs want to litigate here, whether the assignments were made too late to be valid, could and should have been litigated in the prior action." [Record No. 48, p. 24] The Commissioner further argues "there is no reason why the timeliness argument [that the Plaintiffs] now make could not have been made in [Massey I]." [Record No. 48, p. 24] The Trustees correspondingly argue that "[t]he uncontroverted evidence shows that the issue of whether it was proper for [the Commissioner] to make initial assignments after September 30, 1993, is one that could have been and should have been litigated in *Massey I.*" [Record No. 54, pp. 14–15] In support, they indicate that the Commis-

sioner made 297 of the 303 contested assignments before *Massey I* was filed.[20] [Record No. 54, p. 15]

The Trustees also allege that the Plaintiffs "have demonstrated, on more than one occasion, that they were capable of asking SSA whether the agency had made initial assignments to any Massey companies after September 30, 1993," and that the Plaintiffs' "failure to exercise due diligence to determine whether they had received initial assignments after [that date] bars plaintiffs from raising in this lawsuit the [*Dixie* claims]." [Record No. 54, p. 16] They assert that claim preclusion applies even where new claims are based on newly discovered evidence. [Record No. 54, p. 16], citing *L–Tec Elec. Corp. v. Cougar Elec. Org. Inc.,* 198 F.3d 85, 88 (2nd Cir. 1999); *Doe v. Allied–Signal, Inc.,* 985 F.2d 908, 914 (7th Cir.1993); *Guerrero v. Katzen,* 774 F.2d 506, 508 (D.C.Cir.1985). The basic premise of these arguments is that the Plaintiffs could (and should) have contested all post-September 30, 1993, assignments in *Massey I.*

The Plaintiffs respond that neither the *Dixie* nor the *Eastern* claims were ripe for the presentation in *Massey I.* Citing *Katt v. Dykhouse,* 983 F.2d 690 (6th Cir.1992), the Plaintiffs contend that a second lawsuit, even if predicated upon the same transaction, is not precluded where a new question raised in the second case was not legally ripe for adjudication during the first.[21] [Record No. 57, p. 22–23]

---

**20.** The Trustees also argue the remaining 6 assignments could have been challenged in *Massey I,* in that by seeking injunctive relief in that case, the Plaintiffs could have also requested injunctive relief for any assignment made after September 30, 1993. [Record No. 54, p. 15, n. 17]

**21.** All federal cases discussing a second action on the grounds that the new issue raised was not "ripe" in the prior action involved one of two situations, neither of which is present in this case. First, a claim brought in

a subsequent action was not ripe in a preceding action if, under the federal ripeness doctrine, there was no *threat of enforcement* of some law *prior to* the initial action. Here, the threat of enforcement came long before the filing of the initial action. The Commissioner had been making the *Dixie* type assignments prior to the filing of *Massey I. See Katt v. Dykhouse,* 983 F.2d 690 (Insurance agent's First Amendment challenge was not ripe at time agent instituted first action, and that claim did not become ripe until the insurance

Generally, a plaintiff is precluded from litigating issues that *could* have been or *should* have been raised in an earlier action. *Federated Dep't Stores, Inc., v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).[22] However, occasionally, a plaintiff brings a second lawsuit advancing a legal theory based on an intervening change in the law which did not exist at the time of filing of an earlier action. In those cases, "it is nevertheless the general rule that res judicata is no defense where between the time of the first judgment and the second there has been an intervening decision or a change in the law creating an altered situation." *State Farm Mutual Automobile Insurance Co. v. Duel*, 324 U.S. 154, 162, 65 S.Ct. 573, 89 L.Ed. 812 (1945).[23]

Turning to the issue presented here, the opinion in *Dixie* was filed on March 25, 1999, approximately three months *after* the

Plaintiffs filed *Massey I*. Thereafter, the Commissioner petitioned for an *en banc* rehearing, which was denied on July 7, 1999. He also requested and received two 30–day extensions to petition the Supreme Court for a writ of certiorari. [Record No. 57, pp. 17–18 and Exhibits 9, 10] When these period to petition for a writ of certiorari expired, *Dixie* became final.[24] The Court finds that *Dixie* clearly signaled a change in the law regarding the viability of post-September 30, 1993, assignments. According, the Plaintiffs could have raised the *Dixie* claims in *Massey I*.

4. There is no identity of causes of action between those raised in *Massey I* and those alleged herein.

Finally, considering whether there is an identity of the causes of actions, a "cause of action does not consist of facts, but of the unlawful violation of a right which the

Commissioner threatened enforcement after judgment entered in first action.)

More often, an issue in the second action is not ripe in an initial action if a legal finding in the first action is necessary to effectuate the relief requested in the second action. For example, in *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court held that *res judicata* is inapplicable when federal claims advanced in a second suit can be proved until the court in the first case rules on the initial claims. In the instant case, neither of these rules is applicable. Thus, there is no issue of ripeness.

22. *See J.Z.G. Resources, supra,* at 214; *Putnam Pit, Inc. v. City of Cookeville, Tenn.,* 221 F.3d 834 (6th Cir.2000); *see also Wilkins v. Jakeway,* 183 F.3d 528, 532 n. 4 (6th Cir. 1999) (holding that there is no perceived distinction between the terms "could have been litigated" and "should have been litigated"); Restatement (Second) Judgments § 24 (1982) (*Res judicata* extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part or the transaction, or series of connected transactions, out of which the action arose.")

23. *See also Franklin County Convention Facilities Authority v. American Premier Underwriters, Inc.,* 240 F.3d 534, 550 (6th Cir.2001) (rejecting a claim preclusion argument, holding that a change in the legal climate concerning the retroactivity of federal statutory law (CERCLA) permitted a second lawsuit under a recently decided Supreme Court case); *see generally,* 18 Wright, *supra,* § 4425 (2d ed.2002) (stating that "preclusion . . . may be defeated by showing . . . that there has been a substantial change in the legal climate that suggests a new understanding of the governing legal rules which may require different application"); *see also Ervin v. Medtronic Inc.,* 22 Fed.Appx. 462, 2001 WL 1356135, *2 (6th Cir.2001) (holding that legal proposition that a change in the law does not preclude application of res judicata was inapplicable as case was distinguishable on the facts).

24. The Court notes that the Virginia Plaintiffs were aware of the damages caused by *Dixie*-type assignments prior to filing *Massey I*. While theoretically the Plaintiffs could have raised that constitutional issue in *Massey I*, the Court does not believe that this was required under the law. [See Record No. 54, pp. 15–17; record No. 61, p. 8; Record No. 62, pp. 2–5.]

facts show." 18 Wright, *supra,* § 4407 (2d ed.2002). This extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part or the transaction, or series of connected transactions, out of which the action arose." *J.Z.G. Resources,* 84 F.3d, at 215, *citing* Restatement (Second) of Judgments, § 24(1) (1980). Indeed, it appears that this Circuit adopts the Restatement's approach concerning an "identity of causes of action." [25] This section of the Restatement (Second), Dimensions of "Claim" for Purposes of Merger or Bar–General Rule Concerning Splitting, states:

> (2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined *pragmatically,* giving weight to such considerations as *whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit,* and *whether their treatment as a unit conforms to the parties' expectations* or business understanding or usage.

*Id.; see also* 18 Wright, *supra,* § 4407. Comments to § 24 of the Restatement (Second) further state, "[t]he transaction is the basis of the litigative unit or entity which may not be split," and

> underlying the standard is the need to strike a delicate balance between, on the one hand, the interests of the defendant and of the courts in bringing litigation to a close and, on the other, the interest of the plaintiff in the vindication of a just claim.

*Id.,* Comment (a) and (b).

In *Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 582 (6th Cir., 1994), the court held that *res judicata* was inapplicable where "[t]he two claims were not simply two separate grounds of recovery, but instead stemmed from entirely separate and discrete events and wrongful acts by the union." This seems to be a slight embellishment of the Restatement's "transaction" rule. However, the Court has also indicated that an "identity of claims" is satisfied if "the claims arose out of the same transaction or series of transactions, or whether the claims arose out of the same core of operative facts." *Browning v. Levy,* 283 F.3d 761 (6th Cir.2002), *quoting In re Micro–Time Mgmt. Sys., Inc.,* 1993 WL 7524, *5 (6th Cir.1993) (unpublished opinion).[26]

■ Accordingly, this Court will apply this "operative facts" test in conjunction with the Restatement's provisions. Thus, the inquiry herein will be whether the claims are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

■ Unfortunately, there are few cases in this Circuit [27] that discuss the applica-

---

**25.** An often-cited federal practice treatise reports that the "Restatement formulation has been adopted by so many of these decisions, representing virtually all federal courts, as to be the predominant federal rule." 18 Wright, *supra,* § 4407.

**26.** It appears that the Sixth Circuit has not adopted a single test under this "identical causes of action" inquiry. In addition to the above cases, the court held in *Westwood Chemical Co., Inc. v. Kulick,* 656 F.2d 1224 (6th Cir.1981), "[t]o constitute a bar, there must be an identity of the causes of action that *is,* an identity of the facts creating the

right of action and of the evidence necessary to sustain each action." *Id., citing State Mutual Life Assurance Co. of America v. Deer Creek Park,* 612 F.2d 259, 269 n. 9 (6th Cir. 1979).

**27.** In *Browning,* 283 F.3d 761, the plaintiff company alleged that the defendant knew or should have known that the settlement of a prior suit and termination of contract involved therein would have a negative, detrimental impact upon it and that earlier events essentially destroyed the company. The plaintiffs' claims alleged that the defendant's connection with the earlier dispute over the

tion of this rule to complicated factual situations, such as the one at hand.[28] Similar to the Fourth Circuit, which correspondingly espouses the Restatement's view, it appears that "[n]o simple test exists to determine whether causes of action are identical for claim preclusion purposes, and each case must be determined separately within the conceptual framework of the doctrine." *Pittston Co. v. U.S.*, 199 F.3d 694, 704 (4th Cir.1999); *see* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, § 4407 (stating that "[e]ach area of substantive law has its own distinctive implications for expectations, reliance, and repose.")

Here, the Commissioner does not contend that the Plaintiffs must bring every claim arising under the Coal Act in the same lawsuit. Rather, he asserts that "by the time Massey gets to each such individual assignment decision ... Massey has reached the atomic level beyond which its dissatisfaction with the Coal Act cannot be further split into different transactions." [Record No. 48, pp. 25–26] He alleges that the assignments in *Massey I* were part of the same assignments challenged in the instant action, and the challenged assignments were part of the same "wave." [Record No. 48, pp. 25–26] These "waves," he argues, are part of the "series of connected transactions" which bar the instant claims. [Record No. 48, pp. 25–26]

Likewise, the Trustees argue that the "pragmatic" approach this Court should use is to focus on the relationships between the assignments challenged herein and those challenged in *Massey I*. [Record No. 54, p. 17] They claim that the assignments named in Count I and II were made on the same day as those challenged in *Massey I*. Thus, they allege the claims are interrelated.[29] [Record No. 54, p. 18] Further, they argue that eighty–one of the beneficiaries challenged herein were also challenged in *Massey I*. [Record No. 54, p. 18] They allege, as a result, that the only difference between this case and *Massey I* is the legal theory asserted [Record No. 54, p. 19; *citing Harrington v. Vandalia–Butler Bd. of Educ.*, 649 F.2d 434 (6th Cir.1981)].

The Plaintiffs argue that the limited scope and timing of *Massey I* make *res judicata* inapplicable. [Record No. 57, p. 16] They claim that under the Restatement's "pragmatic" approach, the manner in which the questions in *Massey I* were presented for limited purpose for fast track resolution[30] and how they overlapped in time with the *Dixie* case, justifies the exclusion of *res judicata*. [Record No. 57, pp. 21–22] They further assert that "it was the parties' clear expectation that [*Massey I*] be limited to one narrow question stemming from the Commissioner's refusal to treat the Virginia Plaintiffs

---

control of the plaintiff auto parts store and the resulting litigation and settlement contributed to the auto parts store's bankruptcy. The court held that the current claims against the defendant "[arose] out of the same transaction" and constituted "the same core of operative facts" as the earlier suit. The court found that, under this standard, *res judicata* was applicable.

**28.** Contrary to the instant action, many of the cases in this Circuit contain factual situations that easily permit conclusory finding of *res judicata. See, e.g., Helfrich v. Metal Container Corp.*, 11 Fed.Appx. 574, 2001 WL 670046

(6th Cir.2001); *Armour v. McCalla,* 16 Fed. Appx. 305, 2001 WL 669999 (6th Cir.2001); *Herron v. Harrison,* 203 F.3d 410 (6th Cir. 2000).

**29.** Of the assignments challenged in *Massey I*, 102 were made on the same day as 303 at issue in the instant action.

**30.** The Eastern District of Virginia is well-known for its "rocket-docket." In fact, the Plaintiffs allege that they chose this forum in *Massey I* largely based on the availability of a speedy declaration. [See Record No. 57, p. 17.]

... as similarly situated to Eastern Enterprises." [Record No. 57, pp. 21–22] The parties' decision to proceed and fully brief their motions for summary judgment without discovery in *Massey I* supports this claim. Plaintiffs also assert that none of the parties in either action expected to combine the claims at issue here and those raised in *Massey·1* as a single case. [Record No. 57, p. 22]

The Trustees argue that the "Massey companies cannot reasonably contend that they would have been inconvenienced in *Massey I* by writing summary judgment briefs" to include the claims alleged herein. [Record No. 62, pp. 8–9] They further assert that the claims would have formed a convenient trial unit. However, "inconvenience" to the parties is not part of the required analysis under this element. Rather, whether the claims would form a convenient *trial unit* and whether treatment as a unit would *conform to the parties' expectations* is the applicable standard.

Examining the timing of the Commissioner's handling of the letters from Defendants concerning the *Dixie* claims, it appears that even the Commissioner was not prepared to litigate the *Dixie* claims alleged herein [31] when *Massey I* was filed. As discussed above, the Sixth Circuit's initial opinion was issued March 25, 1999. The Commissioner's Petition for Rehearing was subsequently denied on July 7, 1999. The Commissioner then obtained two 30–day extensions to petition the Supreme Court for *certiorari.* The second of these expired on December 4, 1999, making *Dixie* a final decision nearly a year after *Massey I* was filed.

On February 3, 2000, Massey submitted a Freedom of Information Act (FOIA) asking the Commissioner how the Social Security Administration would handle post-September 30, 1993, assignments in light of *Dixie.* The SSA's FOIA officer responded on March 3, 2000, that the agency was still formulating an official policy. On March 11, 2000, the SSA issued an opinion, limited to operators in the Sixth Circuit, regarding these assignments. [Record No. 57, p. 19–20] Thus, it took the Commissioner seven months after the initial ruling in *Dixie* to formulate an opinion on post-September 30, 1993, assignments in light of *Dixie.*

As a result, the Court holds that the Commissioner did not expect or anticipate to litigate this issue with *Massey I.* Considering the timing of the events surrounding the *Dixie* claims (that it took months for *Dixie* to become final, the timing of correspondence and follow-up between the parties, and three-month period it took to issue of the SSA's post-*Dixie* position), the Court cannot conclude that these claims would have made a convenience trial unit. At a minimum, there is material issue of fact concerning whether the parties had such an expectation.

Likewise, this Court does not find that each "wave" of assignments should be considered as the same transaction. Rather, the assignments should be examined in light of the alleged statutory authority under which the Commissioner made each assignment. Although the assignments are related in time, origin, and motivation, when the Court considers the narrow question presented for a speedy declaration in *Massey I* and the timing of the above events and views them in light most favorable to the Plaintiff, the Court finds that the claims would not have made a convenient trial unit.

---

**31.** While the Dixie claims herein are similar to those alleged in *Dixie,* the Commissioner had not formulated a policy to handle those types of claims, like the ones herein alleged, at the outset of *Massey I.*

**C. Summary Judgment Is Appropriate For The Plaintiffs On The *Dixie* Claims Because Of Sixth Circuit Precedent.**

The Court now turns to whether the Commissioner of Social Security had authority under the Coal Act to make initial assignments of beneficiaries to coal operators after September 30, 1993, as alleged in Counts I and II of the Complaint. As an initial matter, there is no material difference between the plaintiffs in *Dixie* and the Plaintiffs in the instant action. [See discussion, *supra.*] As noted above, the identical question is present in both cases. This is a question of pure statutory construction as a matter of law and the Sixth Circuit has conclusively held that the Commissioner lacks such authority. *Dixie,* 171 F.3d 1052.

The Commissioner argues that *Dixie* is not controlling outside this Circuit, and, in fact, the SSA issued a policy decision indicating that it will not follow *Dixie* outside of the Sixth Circuit. Even though the Commissioner did not seek *certiorari* review of the Sixth Circuit's decision in *Dixie,* he requested an *en banc* consideration of this issue in *Bellaire Corp. v. Massanari,* 14 Fed.Appx. 424, 2001 WL 856962 (6th Cir.2001) (unpublished opinion), and *Peabody Coal Co. v. Massanari,* 14 Fed. Appx. 393, 2001 WL 857197 (6th Cir.2001) (unpublished opinion). In both of the cases, the court held:

> [r]ecognizing that *Dixie Fuel* controls our disposition of this case, the government explicitly (and the trustees implicitly) concedes that this panel must affirm the district court's decision to declare all initial assignments made after October 1, 1993, null and void. We agree.

The Sixth Circuit, accordingly, denied the petitions for *en banc* hearings.

The Supreme Court granted *certiorari* on this issue in *Bellaire* and *Peabody* on January 22, 2002. However, until the Sixth Circuit reviews these decisions *en banc* or the Supreme Court overrules *Dixie,* that case remains the law of this Circuit. Thus, this Court is duty-bound to follow it. *See Mead Corp. v. Apfel,* 128 F.Supp.2d 1096 (S.D.Ohio 2001).[32]

The Defendants have failed to raise a genuine issue of material fact and it is plainly obvious that Plaintiffs are entitled to judgment as a matter of law under *Dixie.* Therefore, the Commissioner's and the Trustees' motions with respect the *Dixie* claims will be denied and the Plaintiffs are entitled to summary judgment on Counts I and II of their Complaint as a matter of law.

**D. Summary Judgment Is Appropriate For The Plaintiffs On The *Eastern Enterprises* Claims Because The Commissioner Exceeded His Authority In Making the Assignments At Issue.**

Section 9706 of the Coal Act explicitly provides for a three-tiered hierarchical assignment system of beneficiaries to operators. Specifically, it states:

> (a) In general. For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:
>
> (1) First, to the signatory operator which—

---

**32.** The Fourth Circuit does not agree with this Circuit's exposition of the rule. *See Holland v. Pardee Coal Co., Inc.,* 269 F.3d 424 (4th Cir.2001). However, that decision is not controlling or persuasive in this Circuit.

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which-

(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement.

(b) Rules relating to employment and reassignment upon purchase.—For purposes of subsection (a)—

(1) Aggregation rules.—

(A) Related person.—Any employment of a coal industry retiree in the coal industry by a signatory operator shall be treated as employment by any related persons to such operator.

(B) Certain employment disregarded.—Employment with—

(i) a person which is (and all related persons with respect to which are) no longer in business, or

(ii) a person during a period during which such person was not a signatory

to a coal wage agreement,shall not be taken into account.

26 U.S.C. § 9706. Thus,

> the [Commissioner] first must assign eligible beneficiaries to coal mine operators that most recently employed the beneficiaries for at least two years, and were signatories to 1978 or later NBCWAs. 26 U.S.C. § 9706(a)(1). If no such operator exists for a particular beneficiary, the [Commissioner] must assign the beneficiary to an operator that most recently employed the beneficiary and was a signatory to the 1978 or later NBCWAs. 26 U.S.C. § 9706(a)(2). If no such operator exists for a particular beneficiary, the beneficiary must be assigned to a pre–1978 [non-*Eastern Enterprises*-type] signatory operator [still in business] that employed the beneficiary for the longest period of time. 26 U.S.C. § 9706(a)(3). For each beneficiary assigned to it, the coal mine operator must pay a premium to the Combined Fund. 26 U.S.C. § 9704(a).

*In re Blue Diamond Coal Co.*, 79 F.3d 516, 519 (6th Cir.1996). Furthermore, " '[o]rphan' retirees, which the Coal Act refers to as 'unassigned beneficiaries,' are those eligible beneficiaries who cannot be assigned pursuant to any provision of § 9706(a) because their employers have gone out of business." *Id.*, at 519.

In *Eastern Enterprises*, 524 U.S. 498, 118 S.Ct. 2131, the Supreme Court examined the application of the third prong of the assignment hierarchy, § 9706(a)(3).[33] The court held that it was unconstitutional to assign beneficiaries to operators who had never signed a post–1974 agreement

---

**33.** The Commissioner states that Eastern Enterprises "merely held that the application of one provision of the Coal Act in narrowly defined circumstances was unconstitutional. Thus the Act remains valid with respect to, and may be applied to, other circumstances."

[Record No. 48, p. 35] This Court agrees. *Eastern Enterprises only* held the application of the Coal Act to Eastern Enterprises-type operators unconstitutional and the Act still remains valid in regards to all of its provisions, as noted *infra*.

guaranteeing employees life time health benefits and voided those assignments. *Id.* In light of decision, the Commissioner initially delineated these *Eastern Enterprises*-type beneficiaries as unassigned. He then reassigned them to several of the Plaintiffs, who were the signatory operators with the *next* highest priority for the beneficiary in question.

In the instant action, the Plaintiffs allege that the Commissioner's decision to assign 18 beneficiaries and their dependents to them in response to *Eastern Enterprises* was *ultra vires* and should be voided. [Record No. 35, p. 8] On the other hand, the Defendants claim that the Commissioner's assignment gave effect to congressional intent, and, as such, the assignments are lawful. [Record Nos. 48, p. 35–36, and 54, p. 25]

▮ The cardinal rule of statutory construction is that, "if the intent of Congress is clear from the language of the legislation itself, then the courts, as well as the implementing agency, must give effect to the statute as written." *Difford v. Secretary of Health & Human Services,* 910 F.2d 1316, 1318 (6th Cir.1990), *citing Chevron, U.S.A., Inc., v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Chevron,* at 843–44, 104 S.Ct. 2778. Furthermore, "[i]f Congress declined to address a specific question raised in a particular case, then the court must determine whether the agency's resolution of or response to the ambiguity is derived from a permissible construction of the statute." *Difford,* at 1319–20. Thus, the statute will be interpreted according to its plain language, absent any ambiguity, express delegation of authority to the Commissioner, or clear evidence of Congress' intent to the contrary. *See In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 549 (6th Cir.1999).

▮ With respect to the questions presented under Counts III and IV, the statute is unambiguous. The plain language of section 9706(a) expressly instructs that the Commissioner *shall only assign* beneficiaries to the operator with the highest priority. Nothing in this hierarchy is alleged to be nor, in fact, is unclear or in dispute. The statute *only* allows the Commissioner to make assignments to the operator firstly eligible under § 9706(a). Thus, under no circumstances is he given authority to assign liability to the second, third, etc., operator in line. *See e.g., Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) (holding that plain language of the Coat Act did not permit the Commissioner to assign beneficiaries to successor in interest of signatory coal operator).

▮ The statute also does not give the Commissioner *any authority* to alter, amend, or change this system in any way. *See* 26 U.S.C. §§ 9702–9722. Congress did not leave any "gap" for the Commissioner to fill after enactment of the statute in regards to the way the assignment hierarchy is applied. Accordingly, there is no express delegation of power to the Commissioner to change this system, even if one limited application of the statute is unconstitutional.

However, Congress did not explicitly address the situation raised by the present case: whether the Commissioner could unilaterally assign liability to the operator next in line should an assignment to the highest priority operator be declared unconstitutional. Therefore, the court must determine whether the Commissioner's response to *Eastern Enterprises* is derived from a permissible construction of the statute.

The Defendants' argue that the Commissioner should be able to make "next in line" assignments to effectuate congressional intent to assign as many beneficiaries as possible to operators. However, Congress also intended to assign liability to the super-reach backs, which was declared unconstitutional in *Eastern Enterprises*. Thus, not all beneficiaries can be assigned. In fact, Congress realized this and specifically provided for "unassigned" beneficiaries. Furthermore, when Congress has intended for "next in line" assignments to be made, such as what the Commissioner did, Congress has explicitly provided for those assignments by statute. *See* 30 U.S.C. § 932. Congress did not codify a "next in line" provision in the Coal Act and nothing in the record supports such an intent.

Even if Congress did intend to assign beneficiaries to the largest number of operators as possible, this does not, absent some other authorization, permit the Commissioner to do so *ultra vires*.[34] In fact, as indicated above, the statute's plain, unambiguous language *clearly* indicates that Congress did *not* want liability assigned to "next in line" operators, but only to the operator with the highest priority. Accordingly, Congress knew that some of the beneficiaries would have to be designated as unassigned.

In addition, the Defendants assert that the statute's "in business" criteria for operators indicates that only "relevant" employment is to be considered under § 9716(b). They claim that the assignments of the Eastern-type beneficiaries to the Plaintiffs are consistent with the general principles of § 9706(b), in that "it is only *relevant* employment that counts in

the assignment process." [Record No. 48, p. 37] Furthermore, they argue that the Plaintiffs' contention that the resulting operator will always be an Eastern-type operator cannot be reconciled with *Eastern Enterprises*.

Yet, this alleged discrepancy is easily resolved. Nothing prohibits *consideration* of employment with Eastern-type operators under the statute's criteria. Rather, *Eastern Enterprises* only invalidated the *assignment* of beneficiaries to these companies, not the *consideration* of employment with them. Thus, under § 9706, although a beneficiary cannot be *assigned* to an Eastern Enterprises-type operator, the Commissioner shall still include such employment in determining the operator hierarchy.

 The Defendants also ask the Court to approve the Commissioner's assignment of liability to the Plaintiffs by excising the unconstitutional application of § 9706. [Record No. 48, p. 35; Record No. 54, p. 27–29; Record No. 62, pp. 10–11] They argue that when a statute is invalidated only as to some application, like here, that the invalid applications should be excised and the remaining portions left to continue to function. [Record No. 48, p. 35] *Citing Carnival Cruise Lines v. United States*, 200 F.3d 1361, 1367 (Fed.Cir.2000), *cert. denied* 530 U.S. 1274, 120 S.Ct. 2741, 147 L.Ed.2d 1005 (2000). It is well-settled that courts may excise unconstitutional provisions and leave the remaining portions "fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987); *see also Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 46

---

**34.** The Defendants contend that the Plaintiffs would have received the assignments challenged in Counts III and IV but for the existence of Eastern Enterprise-type companies. [Record No. 48, p 36; Record No. 54, p. 30]

This contention will be afforded no weight in this court. The Plaintiffs would not have received the assignments in the question but for the Commissioner's *ultra vires* act.

L.Ed.2d 659 (1976), *Champlin Refining Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932).[35]

However, in *Eastern Enterprises*, 524 U.S. 498, 118 S.Ct. 2131, the Supreme Court excised the unconstitutional *application* of the Coal Act with regards to certain operators. The Court's decision has already accomplished the Defendants' request—excising the unconstitutional application of § 9706(a). Furthermore, there is no request before this Court to actually excise *any provision* of § 9706 under *Alaska Airlines*, 480 U.S. 678, 107 S.Ct. 1476. Thus, all remaining portions of the statute remain "fully operative as a law." *Id.*, at 684, 107 S.Ct. 1476. Therefore, the Defendants' request is more properly examined as one to approve the Commissioner's *ultra vires* construction of the statute. *See Combined Communications Corp. v. U.S. Postal Service*, 891 F.2d 1221, 1226 (6th Cir.1989). As held above, the plain language of the statute defeats this request.

In summary after considering all of the parties' arguments, the Court cannot conclude that the Commissioner's response to *Eastern Enterprises* is derived from a permissible construction of the statute. The plain language of the statute controls the disposition of this case. Since the Eastern-type beneficiaries cannot be assigned to the Plaintiffs in light of the plain language of § 9706(b) and *Eastern Enterprises*, the Commissioner acted *ultra vires* in reassigning the beneficiaries to the Plaintiffs. These beneficiaries can only be classified as unassigned under the hierarchical assignment system designated by Congress.[36] Therefore, summary judgment in favor of the Plaintiffs on Counts III and IV of their Complaint is appropriate. Accordingly, the Court will grant the Plaintiffs' motion with regards to these counts and deny the Commissioner's and Trustees' motions.

For the reasons discussed above, it is hereby ORDERED as follows:

(1) the Plaintiffs' motion for summary judgment is GRANTED;

(2) the Commissioner's motion to transfer, or, in the alternative, for summary judgment is DENIED; and

(3) the Trustees' motion for summary judgment is DENIED.

### ORDER

This matter is before the Court for consideration of the Plaintiffs' Motion For Entry of Judgment Pursuant to Rule 54(b). The Court finds there is no just reason for delay of the entry of final, partial judgment. Accordingly, the Court being otherwise sufficient advised hereby ORDERS that the Plaintiff's Motion is GRANTED. A final Partial Judgment will be entered forthwith in the Plaintiff's favor.

### PARTIAL JUDGMENT

This matter is before the Court for consideration of the Plaintiffs' Motion For Entry of Judgment Pursuant to Rule 54(b). In accordance with the Memorandum Opinion and Order entered on July 23, 2002, and the Order entered concurrently with this Partial Judgment, there is no just reason for delay of the entry of

---

**35.** The Defendants do not argue that Congress' intent to enact the Coal Act depended on the constitutionality of the provisions at issue.

**36.** The Plaintiffs argue that the Coal Act does not provide a statutory basis for the Commissioner's decision to review and to reassign Eastern Enterprises-type beneficiaries once he assigned them as "unassigned." [Record No. 35, pp. 16–17] The Court does not need to examine the merits of this argument under the above result. *See* 26 U.S.C § 9706(f).

partial, final judgment. Accordingly, it is hereby ORDERED and ADJUDGED that:

(1) All assignments of beneficiaries that had not previously been made to either one of the Plaintiffs or to another operator before October 1, 1992, as set forth in Counts I and II of the Amended Complaint and as voided in *Dixie Fuel Co. v. Comm'r of Soc. Sec.*, 171 F.3d 1052 (6th Cir.1999), are NULL and VOID;

(2) All assignments of beneficiaries that were formerly assigned to operators other than the Plaintiffs and that were vacated by the Commissioner pursuant to *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (U.S.), as set forth in Counts III and IV of the Amended Complaint, are NULL and VOID;

(3) All assignments of beneficiaries described in sections (1) and (2) are VACATED;

(4) The Commissioner SHALL RESCIND those assignments described in sections (1) and (2) above and shall notify the Intervenor–Defendant Trustees of the same;

(5) The Commissioner IS ENJOINED from making any further assignments that would meet one or both of the criteria described in sections (1) and (2) above;

(6) There being no just reason for delay this partial Judgment shall be ENTERED; and

(7) That this is a final and appealable partial Judgment.